

1  Roland Tellis (SBN 186269)
   rtellis@baronbudd.com
2  Mark Pifko (SBN 228412)
   mpifko@baronbudd.com
3  BARON & BUDD, P.C.
   1999 Avenue of the Stars, Suite 3450
4  Los Angeles, California 90067
5  Telephone: (310) 860-0476
   Facsimile: (310) 860-0480
6
7  [*Additional Attorneys Below Signature Line*]

8  Attorneys for Plaintiffs

9

10          UNITED STATES DISTRICT COURT
11          CENTRAL DISTRICT OF CALIFORNIA

12 | BRAD AARONS, DOLORES | Case Number: 2:11-cv-07667-PSG-CW
   | KOLLMER, MARY LIMON, LYNETTE | **AMENDED CONSOLIDATED**
13 | BOURNE-MILLER, VICTOR FERRER, | **CLASS ACTION COMPLAINT FOR:**
14 | ROBERT HARE, PAUL PUGLIESE,
   | DARREN BAILEY and JAMES | **(1) Violations of California Consumer**
15 | FREDERIC BONOMO, individually, and | **Legal Remedies Act; (2) Violations of**
16 | on behalf of other members of the general | **Unfair Business Practices Act; (3)**
   | public similarly situated, | **Breach of Implied Warranty pursuant**
17 | | **to Song-Beverly Consumer Warranty**
18 | Plaintiffs, | **Act; (4) Unjust Enrichment; (5) Breach**
   | | **of Written Warranty under the**
19 | vs. | **Magnuson-Moss Warranty Act, 15**
20 | | **U.S.C. § 2301 *et seq.*; (6) Violations of**
21 | BMW of NORTH AMERICA, LLC, a | **Various States' Express Warranty**
   | New Jersey limited liability company, | **Statutes; (7) Violations of Various**
22 | | **States' Implied Warranty Statutes; and**
23 | Defendant. | **(8) Violations of Various States'**
   | | **Consumer Protection Statutes**
24 |
25 | | **JURY TRIAL DEMANDED**
26
27
28

Case No. 2:11-cv-07667-PSG-CW

1   Plaintiffs BRAD AARONS, DOLORES KOLLMER, MARY LIMON,

2   LYNETTE BOURNE-MILLER, VICTOR FERRER, ROBERT HARE, PAUL

3   PUGLIESE, DARREN BAILEY and JAMES FREDERIC BONOMO ("Plaintiffs"),

4   individually and on behalf of all other members of the public similarly situated, alleges

5   as follows:

6       1.      This is a consumer class action concerning a failure to disclose the fact that

7   Continuously Variable Automatic Transmissions installed in certain Mini Cooper Coupe

8   models Mini Cooper Convertible models ("First Generation MINIs"), designed,

9   manufactured, imported, distributed, marketed, and maintained in the United States by

10  Defendant BMW of North America, LLC ("BMW" or "Defendant"), were prone to

11  premature failure and could not reasonably be repaired.  BMW's failure to disclose this

12  material fact presents a safety concern, and has caused consumers to suffer significant

13  monetary damages.

14                          **INTRODUCTION**

15      2.      First Generation MINIs were introduced in the United States in 2002 with

16  great fanfare and public attention.  BMW presented the Mini Cooper as a stylish, high

17  performance, yet affordable vehicle that was priced at less than $20,000.  BMW's

18  marketing strategy for First Generation MINIs was to launch a new class of high-end

19  vehicles.  At the time of the launch, Jack Pitney, general manager of BMW's MINI

20  division in the U.S., explained to the Wall Street Journal, "'[w]e're creating a new

21  segment' of premium small vehicles."[1]

22      3.      BMW employed "unconventional tactics"[2] to drive sales for this newly

23  proclaimed "premium small car segment."[3]  Consistent with the concept of creating a

24  _____

25  [1] *See* "BMW 'Mini' Campaign: Odd to the Max," Karen Lundegaard, Wall Street Journal at B5 (March 1, 2002) (emphasis added).

26  [2] *See* "'Let's Motor' Mini Cooper Campaign Gets In Gear," Jean Halliday, Advertising Age, June 19,

27  2002, available at http://adage.com/article/news/motor-mini-cooper-campaign-gear/34818/ (last visited, August 25, 2011).

28  [3] *See* "MINI Establishes Premium Standard in the Small Car Segment," BMW Press Release, October

1  premium, but small vehicle, BMW's advertisements for First Generation MINIs
2  emphasized their design and performance features.  Among other things, BMW purchased
3  the margins of magazine pages, and placed advertisements with a First Generation MINI
4  driving around the edges of the editorial text to highlight MINI's "cornering" abilities.[4]
5  Additionally, to showcase MINI's good looks and fashionable styling, BMW made a first
6  ever advertising purchase of the *Playboy Magazine* Centerfold space, and placed a picture
7  of a First Generation MINI in the foldout pages, as photographed by a *Playboy Magazine*
8  staff photographer.[5]  Ultimately, Advertising Age, a leading marketing industry trade
9  publication, awarded the First Generation MINI 2002 launch campaign one of its "Best
10 Awards."[6]
11      4.    BMW's aggressive marketing tactics were successful, and consumers and
12 automotive enthusiasts alike bought into the hype.  J.D. Power and Associates awarded
13 First Generation MINIs the 2002 "APEAL" award, based on a survey of owner's
14 *perceptions* of the vehicle's "design, layout, content and performance during the first 90
15 days of ownership."[7]  In its "First Drive Review," *Car and Driver Magazine* said that
16 although the First Generation MINIs were priced in competition with the VW Golf, Ford
17 Focus and Honda Civic, the car is "fun to drive and feels of high quality enough to wear
18 the BMW badge."[8]  Similarly, a Forbes.com review stated, "the Mini Cooper does

19
20 18, 2002, available at http://www.bmwboard.com/news/view.asp?linkid=310 (last visited, August 25, 2011).

21 [4] *See* "MINI USA Launch Exceeds Expectations – Jack Pitney Credits Innovative Marketing,
22 Enthusiastic Dealers On Road to Success," BMW Press Release, May 7, 2003, available at http://www.bmwboard.com/news/view.asp?linkid=351 (last visited, August 25, 2011).

23 [5] *See id.*

24 [6] *See* "The Ad Age Best Awards report 2003," Advertising Age at S-6, May 26, 2003, available at
25 http://adage.com/images/random/best2003.pdf (last visited, August 25 ,2011).

26 [7] *See* "MINI Cooper ranked most appealing," BMW Press Release, October 10, 2002, available at
27 http://www.bmwboard.com/news/view.asp?linkid=308 (last visited, August 25, 2011).

[8] *See* "Mini Cooper – First Drive Review. Der Mini," Daniel Pund, Car and Driver, August 2001,
28 available at http://www.caranddriver.com/reviews/car/01q3/mini_cooper-first_drive_review (last visited, August 25, 2011).

everything a sports sedan should do . . . and at an unheard-of base price of $16,850."[9]
Apparently, a low cost, high performance vehicle with good looks had been created—
BMW was convincing people that a "premium small car segment" could exist.

5.     As a result, would be buyers lined up to get their hands on First Generation
MINIs.  BMW, however, under-budgeted production and could not keep up with the
demand it created.[10]  Buyers waited months to a year for delivery, so BMW was under
pressure to increase production.[11]  By this time, the high demand was not surprising,
because, as Forbes.com said "there's just no competition for that kind of deal anywhere
else on the planet."[12]

6.     There's a saying that if something sounds too good to be true, it probably is.
Plaintiffs are informed and believe, and based thereon, allege that after the dust settled
from BMW's marketing fervor, owners of First Generation MINIs found that they had
been duped because their vehicles did not stand the test of time.  It turns out BMW was
able offer such a fantastic deal because First Generation MINIs' beauty was only skin
deep.  Plaintiffs are informed and believe, and based thereon, allege that in their haste to
create a new "premium small car" market, BMW sacrificed quality to meet demand and
keep the sales price low, and as a result, First Generation MINIs were quickly churned out
with substandard parts and shoddy workmanship.  BMW refuses to take responsibility for
these actions, and instead, prefers that its customers be left to clean up the mess it created.

7.     This case concerns BMW's failure to disclose a material problem and safety
issues concerning Continuously Variable Transmissions ("CVTs") installed in First
Generation MINIs.  The CVT was first offered as an option in First Generation MINIs at

---

[9] *See* "Test Drives  2002 Mini Cooper," Michael Frank, Forbes.com, available at
http://www.forbes.com/2002/03/18/0318test.html (last visited, August 25, 2011).

[10] *See* fn. 3, *supra*, Dr. Michael Ganal, Member of the Board of BMW AG, stated, "the originally
planned annual sales target of 100,000 units has been passed after just nine months."

[11] *See* fn. 2, *supra*.

[12] *See* fn. 9, *supra*.

1    the end of October 2002. The CVTs are prone to sudden premature failure, before the end

2    of the useful life of the vehicle, and well before consumers reasonably expect any such

3    failure to occur. Plaintiffs are informed and believe, and based thereon, allege that a

4    vehicle's automatic transmission is intended and reasonably expected to last for at least

5    ten years, if not more, without the need for repair or replacement. Nevertheless, Plaintiffs

6    are informed and believe, and based thereon, allege that BMW installed defective CVTs

7    in First Generation MINIs, knowing that they were prone to premature failure.

8        8.    As a result of BMW's failure to disclose the fact that CVTs installed in First

9    Generation MINIs were prone to unavoidable premature failure, consumers are required

10    to spend approximately $6,000 to $9,000 (one-third to one-half of the original purchase

11    price) to repair or replace their CVTs, or sell their vehicle without repair for a substantial

12    loss. The fact that the CVTs installed in First Generation MINIs were prone to premature

13    failure is material because no reasonable consumer expects that they will have to spend

14    approximately one-half to one-third of the cost of a vehicle for repairs in the early years of

15    vehicle ownership.

16        9.    Additionally, the fact that CVTs installed in First Generation MINIs were

17    prone to sudden premature failure is material to consumers because it presents a safety

18    issue and places the driver and passengers at risk of serious harm. When CVTs fail, they

19    do so without warning, resulting in a complete loss of power to the drive wheels. When

20    CVTs fail while a vehicle is moving, occupants of the vehicle are exposed to rear end

21    collisions and other accidents caused by the driver's inability to maintain an appropriate

22    speed. Accordingly, the fact that the CVTs installed in First Generation MINIs were

23    prone to premature failure also is material because there is no safe alternative way for

24    First Generation MINI owners to use their vehicles to avoid the risk of potential harm.

25        10.    Plaintiffs and members of the Class (as defined below) would not have

26    bought First Generation MINIs had they known that the CVTs installed in the vehicles

27    were prone to unavoidable dangerous premature failure. When Plaintiffs and members of

28    the Class purchased First Generation MINIs, they relied on their reasonable expectation

1   that First Generation MINIs did not pose an unavoidable safety risk.  Indeed, the safety of

2   the vehicle is particularly material given the small size of the vehicles.  Furthermore, had

3   BMW timely disclosed to consumers the material fact that CVTs installed in First

4   Generation MINIs were prone to premature failure, First Generation MINI owners would

5   have required BMW to replace their CVTs before the warranty expired.  BMW neither

6   disclosed material facts to consumers at the time of purchase, nor anytime thereafter.

7        11.    Plaintiffs are informed and believe, and based thereon, allege that BMW has

8   been aware that CVTs installed in First Generation MINIs were prone to premature

9   failure, yet the company not only refused to disclose the problem, BMW actively denied

10   knowledge of it, and instead, undertook affirmative efforts to conceal the failures through,

11   among other things, a series of Technical Service Bulletins issued to repair facilities.

12   BMW concealed the fact that CVTs installed in First Generation MINIs were prone to

13   premature failure so that the warranty period on First Generation MINIs will expire before

14   owners become aware of the problem.  Through this practice, BMW unlawfully transfers

15   the cost of replacement from itself to the vehicle's owner.

16        12.    As a result of its failure to disclose the material fact that CVTs installed in

17   First Generation MINIs were prone to premature failure, BMW has recklessly placed the

18   safety of the owners and occupants of First Generation MINIs at risk, and caused owners

19   of those vehicles to suffer damages.  Plaintiffs seek, on behalf of themselves and the Class

20   (as defined below) injunctive relief, restitution, damages, and other appropriate relief.

21                    **JURISDICTION AND VENUE**

22        13.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2).  The

23   matter in controversy, exclusive of interest and costs, exceeds the sum or value of

24   $5,000,000 and is a class action in which members of the Class (as defined below) are

25   citizens of states different from Defendant.  There are at least 100 members of the Class.

26   Further, greater than two-thirds of the members of the Class reside in states other than the

27   states in which Defendant are citizens.  In addition, under 28 U.S.C. § 1367, this Court

28   may exercise supplemental jurisdiction over the state law claims because all of the claims

1   are derived from a common nucleus of operative facts and are such that plaintiffs

2   ordinarily would expect to try them in one judicial proceeding.

3        14.    Venue lies within this judicial district under 28 U.S.C. § 1391(a) and (c)

4   because BMW has sufficient contacts with this District to subject it to personal

5   jurisdiction in this District, and a substantial part of the events and omissions giving rise

6   to the claims asserted in this Complaint occurred within this District.

7                                    **PARTIES**

8        15.    Plaintiff Brad Aarons is an individual and a citizen of California.

9        16.    Plaintiff Dollores Kollmer is an individual and a citizen of California.

10       17.    Plaintiff Mary Limon is an individual and a citizen of California.

11       18.    Plaintiff Lynette Bourne-Miller is an individual and a citizen of South

12   Carolina.

13       19.    Plaintiff Victor Ferrer is an individual and a citizen of New Jersey.

14       20.    Plaintiff Robert Hare is an individual and a citizen of Kentucky.

15       21.    Plaintiff Paul Pugliese is an individual and a citizen of Connecticut.

16       22.    Plaintiff Darren Bailey is an individual and a citizen of Illinois.

17       23.    Plaintiff James Frederic Bonomo is an individual and a citizen of Florida.

18       24.    Defendant BMW of North America, LLC is a New Jersey limited liability

19   company with its principal place of business located at 300 Chestnut Ridge Road,

20   Woodcliff Lake, New Jersey 07677, and doing business in the State of California.

21   Plaintiffs are informed and believe, and on that basis, allege that BMW of North America,

22   LLC is responsible for the importation, distribution, marketing and sale of all 2002

23   through 2006 Mini Cooper Coupe models and 2005 through 2008 Mini Cooper

24   Convertible models in the United States and California.  BMW of North America, LLC is

25   a wholly owned subsidiary of BMW (US) Holding Corporation, a Delaware corporation,

26   which is a wholly owned subsidiary of Defendant Bayerische Motoren Werke AG.

27       25.    Whenever, in this Complaint, reference is made to any act, deed, or conduct

28   of BMW, the allegation means that BMW engaged in the act, deed, or conduct by or

1 | through one or more of its officers, directors, agents, employees or representatives who

2 | was actively engaged in the management, direction, control or transaction of the ordinary

3 | business and affairs of BMW.

4 | **FACTUAL BACKGROUND**

5 | 26.   BMW designed, manufactured, imported, distributed, and marketed First

6 | Generation MINIs in the United States, including California.  BMW also provides

7 | maintenance services for First Generation MINIs through its nationwide network of

8 | authorized dealers and service providers.

9 | 27.   First Generation MINIs are equipped with CVTs that fail prematurely,

10 | without warning, and well before the end of the useful life of the vehicles.  As a result of

11 | the failure, CVTs becomes completely inoperable and must be replaced.  Consequently,

12 | First Generation MINI owners are required to incur substantial costs to replace their

13 | CVTs, or sell their vehicles for a substantially reduced price, causing them to suffer a

14 | monetary damages of approximately $6,000 to $9,000.  Additionally, because the CVT

15 | fails without warning, it poses a safety concern that is not reasonably avoidable for

16 | occupants of the vehicles who are placed at risk being struck by other vehicles in traffic.

17 | 28.   Plaintiffs are informed and believe, and based thereon, allege that reasonable

18 | alternative designs exist for automatic transmissions, and that BMW was aware of these

19 | reasonable design alternatives.

20 | 29.   Hundreds of First Generation MINI owners have reported such complaints,

21 | and BMW is well aware of the problem and safety risks.  Plaintiffs are informed and

22 | believe, and based thereon, allege that these complaints have been made to BMW directly,

23 | including through the company's network of dealerships, and to BMW's customer service

24 | agents.  Additionally, the National Highway Transportation and Safety Administration

25 | ("NHTSA") has documented approximately 100 complaints concerning this issue.  BMW

26 | refuses to offer any remedy, or even publicly acknowledge the problem.  Instead, BMW

27 | took steps to actively conceal the defect from consumers.

28 | 30.   BMW knew that the CVTs installed in First Generation MINIs were plagued

1   with problems from the beginning.  Plaintiffs are informed and believe, and on that basis,

2   allege that not long after CVT-equipped First Generation MINIs were first offered for sale

3   in October of 2002, BMW immediately began receiving reports of premature CVT

4   failures, and by the end of 2002, BMW was aware of such a significant amount of failures

5   that the company's engineers had begun looking for a solution.  Nevertheless, although

6   BMW was well aware of significant numbers of CVT failures in late 2002, BMW kept it a

7   secret and failed to disclose the problem, even as it continued to sell vehicles equipped

8   with CVTs that were prone to unsafe premature failures.

**Technical Service Bulletins**

10      31.     Among other things, BMW's knowledge of the CVT problems since late

11   2002 is evidenced by series of Technical Service Bulletins ("TSBs") issued by the

12   company beginning only a few months after CVT-equipped First Generation MINIs were

13   first offered for sale in October 2002.

14      32.     BMW's TSBs are numbered according to the following protocol:

15   SI M## ## ##, where "SI" stands for Service Information; "M" stands for MINI; the first

16   two numbers refer to the "group," or part of the vehicle that is the subject of the TSB,

17   with the number "24" referring to the CVT; the second two numbers provide a counter

18   (e.g., 01, 02, 03) to count the TSBs issued for a specific group in a particular year; and

19   finally, the third two numbers refer to the year the TSB was first issued.

20      33.     In December 2002, BMW issued one of the first TSB demonstrating the

21   company's awareness of widespread premature CVT failures.  In this TSB (number

22   SI M24 01 02), BMW noted, "the CVT transmission may fail prematurely."

23   Nevertheless, Plaintiffs are informed and believe, and on that basis, allege that rather than

24   disclose the problem and offer an adequate solution, BMW attempted to conceal it.

25      34.     TSB number SI M24 01 02 shows that, in several ways, BMW attempted to

26   conceal its knowledge of the significant number of premature CVT failures that began to

27   amass only months after CVT-equipped First Generation MINIs came to market.  First,

28   BMW mischaracterized the issue by claiming that "incorrect" viscosity oil was filled into

1  the CVT transmission during production.  Plaintiffs are informed and believe, and on that

2  basis, allege that the transmission oil filled into CVT transmission from August 13, 2002

3  to October 23, 2002 was the correct oil at the time it was filled into the CVT, and it was

4  only identified as "incorrect" by BMW after the transmission oil specification was

5  changed in response to BMW's awareness that CVTs were experiencing widespread

6  premature failures.  Second, when BMW issued TSB number SI M24 01 02, it concealed

7  its knowledge that the CVT failures were widespread by characterizing the problem as

8  only applying to a limited segment of the production run.  Plaintiffs are informed and

9  believe, and on that basis, allege, however, that the production run at issue in TSB number

10  SI M24 01 02 was not just any two month production period, it was the first months of

11  production of CVT-equipped First Generation MINIs.  Finally, Plaintiffs are informed and

12  believe, and on that basis, allege that rather than adequately address the problem with a

13  permanent solution, TSB number SI M24 01 02 shows that BMW tried to conceal its

14  knowledge of premature CVT failures by changing the transmission oil specification mid-

15  production, hoping that by using different viscosity transmission oil, BMW would stem

16  the rising tide of CVT failures, at least until customers' warranties expired.

17      35.    Furthermore, Plaintiffs are informed and believe, and on that basis, allege

18  that as a result of the high rate of premature CVT failures, in late 2002, in addition to

19  changing the transmission oil specification, BMW's engineers were researching the CVT

20  failures in an attempt to develop other ways to avoid repairing and replacing the CVT

21  transmissions.

22      36.    BMW's knowledge and concealment of the CVT failures is further

23  documented by TSB number SI M24 01 03.  As a result of BMW's engineering research

24  concerning CVT failures that began in late 2002, BMW issued TSB number SI M24 01 03

25  in March 2003.  Shockingly, TSB number SI M24 01 03 was issued only approximately

26  six months after CVT-equipped First Generation MINIs were first offered for sale in the

27  United States and California.  As BMW continued to ramp up production and respond to

28  increasing sales demand (*see e.g.*, ¶ 5), it was already having to provide a dealer-wide

1    message to address complaints concerning CVT failures.  The subject line alone of TSB

2    number SI M24 01 03, "MINI CVT Transmission Repair & Replacement Information,"

3    shows that BMW was aware of widespread premature CVT failures, requiring "repair &

4    replacement," when it issued this TSB in March 2003.

5         37.    As TSB number SI M24 01 03 shows, by March 2003, CVT failures had

6    become so prevalent that BMW arranged for the assignment of a CVT "TECHNICAL

7    SPECIALIST [who] must be contacted whenever a MINI CVT vehicle is brought into the

8    service area, with a transmission related concern" (emphasis in original).  In furtherance

9    of its scheme to fraudulently conceal material information from Plaintiffs and members of

10   the Class, TSB number SI M24 01 03 reveals that BMW was trying to control the flow of

11   information concerning CVT failures, and reduce its costs and culpability by denying

12   CVT-related warranty claims.  Among other things, BMW stated, "**[a]ll CVT**

13   **transmission replaced without a prior authorization from the Technical Hotline will**

14   **result in the Warranty, Goodwill or Certified Pre-Owned claim being rejected!**"

15   (emphasis in original).  Similarly, TSB number SI M24 01 03 stated, "[w]e encourage all

16   MINI dealers to make use of . . . 'customer pay' repairs" and "[t]he replacement of a

17   complete CVT transmission without prior approval will be subject to debit" (emphasis in

18   original).  Despite BMW's knowledge that CVTs were prone to premature failure, with

19   some requiring replacement only approximately six months after they were first sold,

20   BMW actively concealed this material information from consumers as they continued to

21   lease and purchase First Generation MINIs equipped with CVTs.

22        38.    Subsequently, in November 2004, BMW issued another TSB concerning

23   CVT failures.  Plaintiffs are informed and believe, and on that basis, allege that a TSB is

24   issued only after many months, or more, of engineering research.  Accordingly, TSB

25   number SI M24 01 04 reveals BMW's continued awareness and active concealment

26   concerning premature CVT failures dating back to well before it was issued.

27        39.    Through TSB number SI M24 01 04, BMW stated that it was issuing special

28   tools and repair instructions for an input shaft seal to avoid replacing CVT transmissions.

1    Additionally, in TSB number SI M24 01 04, BMW noted that "[r]eplacement of CVT

2    transmissions are no longer necessary when the input shaft seal is leaking transmission

3    fluid." By stating "*no longer* necessary," this TSB makes clear that BMW not only knew

4    that CVTs were experiencing significant failures, it also knew that CVTs were routinely

5    being replaced well before this TSB was issued. TSB number SI M24 01 04 reveals that

6    as a result BMW's awareness of these failures dating back to 2002 and 2003, BMW

7    undertook efforts to develop and implement a comprehensive plan to design, manufacture,

8    and distribute special tools to stem the tide of CVT transmissions that required

9    replacement. The special tool sets to repair CVTs were issued through two separate TSBs

10   (nos. SI M04 06 04, and SI M04 04 04).

11        40.    The TSBs issued by BMW in November 2004 apparently failed to resolve

12   the CVT failures, however, because, approximately one and a half years later, BMW

13   issued yet another TSB concerning the CVT (no. SI M04 01 06). Through TSB number

14   SI M04 01 06, BMW distributed an additional set of tools designed to service the CVT

15   input shaft bearings for the purpose of repairing a "howling noise from the transmission."

16        41.    Nevertheless, despite BMW's on-going efforts to conceal the issue, customer

17   complaints and CVT failures persisted. Accordingly, Plaintiffs are informed an believe,

18   and based thereon, allege that BMW issued another TSB (no. SI M24 02 06) to give

19   guidance to dealerships on how to respond to the problem. Rather than openly disclose

20   the material failures concerning the CVT, however, according to TSB number

21   SI M24 02 06, if a First Generation MINI was experiencing "a howling type of noise

22   coming from the CVT transmission," BMW expressly instructed its dealerships as

23   follows: "[o]**n a customer complaint basis only**, replace the main CVT ball bearing

24   together with the flange bolts, cover & oil pump O-rings and the plate spring." (*See* TSB

25   no. SI M24 02 06, emphasis in original.) Thus, not only did BMW fail to disclose the

26   material information concerning CVT failures to consumers who bought First Generation

27   MINIs, the company intentionally designed a plan to conceal the truth from First

28   Generation MINI owners, making it less likely that they would have their CVT replaced

1 | before the warranty expired.

2 |     42.    In February 2006, BMW also issued an updated version of TSB number

3 | SI M24 01 03 that superseded the version originally issued in March 2003. Through the

4 | updates to this TSB, in an attempt to gather data about the premature CVT failures, BMW

5 | requested that service technicians submit data about the failures to BMW, telling them,

6 | "[i]nclude 'CVT' in the subject line" with details "sufficient to ensure that the person

7 | reading your case will be able to understand the situation and/or duplicate it if necessary."

8 | The February 2006 updates to TSB number SI M24 01 03 also reveal that BMW

9 | continued to deny complete warranty coverage for CVT failures, stating, "[w]hen MINI

10 | USA pays for all or *a portion of* a CVT transmission replacement . . ." (emphasis added).

11 |     43.    Despite the above chain of events, BMW did not inform Plaintiffs and

12 | members of the Class of its knowledge of the CVT failures, before they purchased or

13 | leased their vehicles, nor during the time when the warranty was in place, which would

14 | have allowed them to timely obtain warranty repairs, and even when Plaintiffs expressly

15 | demanded warranty coverage, BMW continued to deny knowledge of the failures and

16 | refused to provide an adequate remedy.

17 | **NHTSA Complaints**

18 |     44.    Notwithstanding the TSBs, BMW also is aware of the fact that CVTs

19 | installed in First Generation MINIs are prone to premature failure because of the

20 | numerous complaints concerning the issue that have been made to the NHTSA.

21 | Nevertheless, even in the face of these complaints, BMW continues to deny that there is a

22 | problem with the CVTs and refuses to disclose the truth to consumers.

23 |     45.    A small sample of the complaints regarding CVT failures reported to the

24 | NHTSA is as follows:

25

26

27

28

Make : MINI                Model : COOPER                Year : 2002

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                 Fire : No                     Number of Injuries: 0

ODI ID Number : 10000426                                 Number of Deaths: 0

Date of Failure: October 28, 2002

VIN : Not Available

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    I AM HAVING A PROBLEM WITH MY 2002 MINI COOPER, IT IS EXPERIENCING
PROBLEMS WITH THE TRANSMISSION AND IT HAS BEEN IN THE SERVICE DEPARTMENT
IN THREE SEPARATE OCCASION TOTALLYING 54 DAYS, THE LAST TIME THAT IT WAS IN
THE SERVICE DEPARTMENT IT WAS 40 DAYS. THEY FINALLY SAID THE PROBLEM WAS
CORRECTED, BUT IT TOOK THEM THAT LONG TO FIGURE OUT WHAT WAS WRONG. I
CALLED THE DEALERSHIP AND TOLD THEM THAT I WANTED TO BE COMPENSATED
ONLY FOR THE DAYS THE CAR WAS AT THEIR SHOP, ALSO I INFORMED THEM THAT IF
THE MINI HAS TO BE TAKEN TO THE SHOP AGAIN, THAT WILL FORCE ME TO ENFORCE
THE LEMON LAW. MELISSA STEFFY, THE GENERAL MANAGER, SAID FOR ME TO SEND
HER THE LETTER AND SHE WIL SEE WHAT SHE CAN DO, BUT THAT IT WAS UNLIKELY
THAT THEY WOULD COMPENSATE FOR ANYTHING. I DON'T THINK IT'S FAIR BECAUSE I
PURCHASED THE CAR TO USE IT, NOT FOR THEM TO HAVE IT IN THE DEALER'S SERVICE
DEPARTMENT. I WOULD APPRECIATE IF YOU COULD ASSIST ME WITH THIS MATTER.
THANKS LEYDA RAMOS FOR EDID BATISTA : LRMIA@AOL.COM

Make : MINI                Model : COOPER                Year : 2002

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                 Fire : No                     Number of Injuries: 0

ODI ID Number : 10269497                                 Number of Deaths: 0

Date of Failure: May 13, 2009

VIN : WMWRC33412T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    TRANSMISSION WHINING NOISE EVENTUALLY LEADING TO TRANSMISSION
FAILURE. MINI IS AWARE OF THIS PROBLEM WITH CVT TRANSMISSIONS AND REFUSES
TO ADMIT FAULT. VERY COMMON PROBLEM OCCURRING IN MOST 2002 VEHICLES
WITH ONLY 40,000-60,000 MILES ON THEM. COST IS 7000 TO REPLACE. MINI DOES NOT
OFFER REPAIR ON THIS PART. *TR

Make : MINI                          Model : COOPER                          Year : 2002

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                           Fire : No                               Number of Injuries: 0

ODI ID Number : 10211394                                                     Number of Deaths: 0

Date of Failure: November 30, 2007

VIN : WMWRC33442T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    I HAVE A 2002 MINI COOPER WITH A CVT AUTOMATIC TRANSMISSION. THE
TRANSMISSION HAS FAILED. THE CARE HAS ABOUT 61,000 MILES. THE TRANSMISSION
HAS TO BE REPLACED COSTING ME AT LEAST $6,000. *TR


Make : MINI                          Model : COOPER                          Year : 2003

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                           Fire : No                               Number of Injuries: 0

ODI ID Number : 10392840                                                     Number of Deaths: 0

Date of Failure: November 19, 2010

VIN : WMWRC33473T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    MY 2003 MINI COOPER HAS HAD TOTAL TRANSMISSION FAILURE (CVT
TRANSMISSION) AT ONLY 46,129 MILES. FAILURE WAS TOTAL AND SUDDEN AND
VEHICLE IS UNDRIVEABLE WITHOUT NEW TRANSMISSION. THE DEALER QUOTED ME A
COST OF $10,055.44 (PARTS $6,943.28, LABOR $2,700 + TAX). THIS COST IS MORE THAT THE
VEHICLES' CURRENT VALUE. I HAVE BEEN TOLD THAT ONLY A NEW CVT
TRANSMISSION CAN REPLACE THE FAULTY ONE, AND EVEN THEN THAT TRANSMISSION
MAY AGAIN FAIL AS THEY ARE SUCH TERRIBLE TRANSMISSIONS. THE CAR WILL NOT
TAKE ANY OTHER TRANSMISSION OPTION. THE DEALER BASICALLY LAUGHED AND
SAID, "I DON'T SUPPOSE YOU HAVE AN EXTRA $10,000 LAYING AROUND," WHEN HE
TOLD ME THE COST OF THE REPAIR. THE DEALER HAS OFFERED NO ASSISTANCE IN
LOWERING THE COST, BUT BASICALLY SAID "TOUGH LUCK" AND TAKEN NO
RESPONSIBILITY. THE CAR IS USELESS AND UNFIXABLE AT THIS COST. A RECALL
SHOULD BE DONE AS CONSUMERS HAVE BEEN SOLD A FAILED TRANSMISSION, AND
THE SAFETY OF THIS CAR'S TRANSMISSION IS TOTALLY FAULTY. *TR

Make : MINI                    Model : COOPER                    Year : 2003

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                    Fire : No                    Number of Injuries: 0

ODI ID Number : 10335358                    Number of Deaths: 0

Date of Failure: June 7, 2010

VIN : WMWRC33403T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    THE CVT TRANSMISSION ON MY 2003 MINI COOPER HAS FAILED RENDERING THE
CAR NOT DRIVABLE. THE TRANSMISSION HAS ALWAYS BEEN QUIRKY, BUT I WAS
ASSURED BY THE DEALER THAT IT WAS WORKING PROPERLY. THE TRANSMISSION
SLIPS DRASTICALLY AND MAKES A VERY AUDIBLE WHIRRING SOUND. THE ONLY
OPTION FOR REPAIR IS A COMPLETE NEW PART INSTALL AT THE DEALER COST OF
$8,800. I HAVE READ HUNDREDS AND HUNDREDS OF IDENTICAL STORIES ABOUT THE
CVTS ON MINI COOPERS AS WELL AS THE POWER STEERING PUMP. IT SEEMS FROM
RESEARCH THAT THIS PART COMMONLY FAILS AND REPLACING WITH A DEFECTIVE
PART AT A COST NEAR NINE THOUSAND DOLLARS IS ABSURD AND DISGUSTING. IT IS
COST PROHIBITIVE TO KEEP MY CAR OPERATING AND I FEEL AS THOUGH I HAVE, AS
WELL AS THOUSANDS OF OTHER MINI OWNERS HAVE BEEN SOLD A DEFECTIVE
PRODUCT WORTHY OF RECALL. *TR


Make : MINI                    Model : COOPER                    Year : 2005

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                    Fire : No                    Number of Injuries: 0

ODI ID Number : 10262055                    Number of Deaths: 0

Date of Failure: March 12, 2009

VIN : WMWRC335X5T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    TL*THE CONTACT OWNS A 2005 MINI COOPER. WHILE DRIVING 25 MPH, THE VEHICLE
JERKED AND MADE RATTLING AND POPPING SOUNDS. THE VEHICLE SHUT OFF AND THE
CONTACT PUSHED IT TO THE SIDE OF THE ROAD. THE KEY COULD NOT BE REMOVED
FROM THE IGNITION AND THE VEHICLE HAD TO BE TOWED TO THE DEALER. SHE WAS
INFORMED THAT THE TRANSMISSION FAILED AND WOULD COST $7,000 TO REPAIR. THE
CONTACT WILL CALL THE MANUFACTURER FOR ASSISTANCE. THE FAILURE MILEAGE
WAS 62,000.

1

**Safety Concerns**

2    46.    In connection with its failure to disclose the fact that CVTs are prone to

3 premature failure, BMW also risks the safety of occupants of First Generation MINIs.

4 When CVTs prematurely fail, without warning, while the vehicle is moving or in traffic,

5 drivers lose the ability to accelerate or maintain appropriate speed, thereby increasing the

6 risk of a crash.  The reasonable expectation that First Generation MINIs were safe was,

7 and is, material to Plaintiffs and members of the Class, particularly because of the small

8 size of the vehicles.

9    47.    Indeed, numerous First Generation MINI drivers have reported their safety

10 concerns to the NHTSA.  A small sample of these reports is as follows (emphasis added):

11

12 Make : MINI                    Model : COOPER                        Year : 2002

13 Manufacturer : BMW OF NORTH AMERICA, LLC

14 Crash : No              Fire : No                    Number of Injuries: 0

15 ODI ID Number : 10276566                          Number of Deaths: 0

   Date of Failure: July 11, 2009

16 VIN : WMWRC33412T...

17 Component: POWER TRAIN:AUTOMATIC TRANSMISSION

18 Summary:
       TL*THE CONTACT OWNS A 2002 MINI COOPER. THE VEHICLE SHUT OFF WHILE
19 DRIVING APPROXIMATELY 25 MPH. THERE WERE NO WARNINGS PRIOR TO THE
   TRANSMISSION FAILURE. THE CONTACT FEELS THAT THIS IS A **SERIOUS SAFETY ISSUE**
20 **BECAUSE A CRASH COULD HAVE OCCURRED**. THE FAILURE MILEAGE WAS 63,000.

21

22

23

24

25

26

27

28

Make : MINI                    Model : COOPER                    Year : 2002

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                     Fire : No                        Number of Injuries: 0

ODI ID Number : 10241197                                        Number of Deaths: 0

Date of Failure: August 3, 2008

VIN : WMWRC33472T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
     THE AUTOMATIC TRANSMISSION OF MY 2002 MINI COOPER FAILED WHILE MY
FRIEND WAS DRIVING MY CAR. **SHE WAS ON A WINDING COASTAL ROAD AND THE
CAR DIED ON A BLIND CURVE, PUTTING HER AT GREAT DANGER**. FORTUNATELY
NOBODY WAS HURT. THE CAR WAS TOWED TO THE SAN FRANCISCO BMW
DEALERSHIP, WHERE I WAS INFORMED I NEEDED A $8500 "REFURBISHED"
TRANSMISSION, AS THE TRANSMISSION IS NOT EVEN MADE ANYMORE. RESEARCH ON
LINE SHOWS THAT THIS BECOMING A FREQUENT PROBLEM WITH "FIRST
GENERATION" MINIS WITH THE "CVT" AUTOMATIC TRANSMISSION. I DECLINED THE
REPAIR AND SOLD THEM THE CARCASS OF MY CAR. **THIS IS A DANGEROUS PROBLEM
AND BMW/MINI IS NOT ACCEPTING RESPONSIBILITY**. *TR


Make : MINI                    Model : COOPER                    Year : 2002

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                     Fire : No                        Number of Injuries: 0

ODI ID Number : 10237175                                        Number of Deaths: 0

Date of Failure: August 5, 2002

VIN : WMWRC33432T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
     I AM THE SECOND OWNER (BOTH OLDER LADIES), OF A 2002 AUTOMATIC MINI
COOPER WITH 46,000 MILES. YESTERDAY WHILE DRIVING HOME FROM WORK THE
TRANNY FAILED. IT DOWNSHIFTED OR SOMETHING AND THE EP WARNING LIGHT
CAME ON, WHICH MEANS **TRANSMISSION FAILURE AND I WAS TWO FEET AWAY
FROM BEING REAR ENDED! I COULD HAVE BEEN KILLED**. AFTER RESEARCHING ON
LINE, I HAVE READ GREAT AMOUNTS OF CONSUMERS WITH THE SAME COMPLAINT. IT
IS DANGEROUS AND VERY COSTLY ACCORDING TO THE FIGURES I'VE READ OF
PEOPLE WHOSE HAD THEIRS FIXED OR REPLACED. THESE CARS WITH **THE CVT
TRANSMISSIONS NEEDS TO BE ANNOUNCED TO THE PUBLIC FOR SAFETY REASONS**
ALONE NOT EVEN TO MENTION THE COST! SINCERELY, BONNIE QUINN *TR

Make : MINI                    Model : COOPER                    Year : 2003

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                     Fire : No                        Number of Injuries: 0

ODI ID Number : 10383299                                        Number of Deaths: 0

Date of Failure: February 18, 2011

VIN : WMWRC33433T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    I OWN A 2003 MINI COOPER WITH A CVT AUTOMATIC TRANSMISSION, TRANSMISSION
AND FRONT DIFFERENTIAL FILED AT 58000 MILES LUCKY FOR ME I WAS NOT ON THE
INTERSTATE OR BUSY TRAFFIC AS A SERIOUS ACCIDENT COULD HAVE OCCURRED.
MINI USA ARE TOTALLY AWARE OF THE PROBLEM AND STOPPED PUTTING THIS
DEFECTIVE PART IN NEWER MODEL VEHICLES. THEY WILL ALSO NOT STAND BEHIND
THEIR PRODUCT AND ARE UNWILLING TO RECTIFY IT. **THERE ARE HUNDREDS OF
PEOPLE WITH THIS SAME ISSUE CONCERNING THIS TRANSMISSION BUT FOR
WHATEVER REASON THERE IS STILL NO SAFETY RECALL. I HOPE IT IS NOT GOING
TO TAKE SOMEONE TO BE KILLED OR SERIOUSLY INJURED BEFORE ANYTHING IS
DONE.** ALSO THE BUSHINGS ON THE DRIVERS SIDE A FRAME ARE BAD WCH IN MY
OPINION IS A SERIOUS FAULT AND COULD BE EXTREMELY DANGEROUS. COST OF
REPLACEMENT IS 7,000+ THESE CARS ARE ROLLING DEATH TRAPS IN MY OPINION AND
SOMEONE NEEDS TO BE HELD ACCOUNTABLE. *LN


Make : MINI                    Model : COOPER                    Year : 2004

Manufacturer : BMW OF NORTH AMERICA, LLC

Crash : No                     Fire : No                        Number of Injuries: 0

ODI ID Number : 10299826                                        Number of Deaths: 0

Date of Failure: July 10, 2008

VIN : WMWRC334X4T...

Component: POWER TRAIN:AUTOMATIC TRANSMISSION

Summary:
    MY 2004 MINI COOPERS **TRANSMISSION FAILED AT 80K MILES WITH NO WARNING.
LUCKILY I WAS IN A PARKING LOT AND NOT ON THE HIGHWAY, WHERE I COULD
HAVE BEEN KILLED.** THE COST OF REPLACING THE TRANNY WAS $7,000. MINI USA WAS
USELESS WHEN I PLEADED WITH THEM TO HELP ME. AFTER READING ABOUT ALL OF
THE OTHER COMPLAINTS WITH THE CVT TRANS, I CAN'T BELIEVE THERE WAS NO
RECALL. I WILL NEVER BUY A MINI AGAIN. I STILL OWE $11,000 ON THE CAR AND
CANNOT AFFORD ANOTHER. *TR

## PLAINTIFFS' CLAIMS AGAINST BMW

### Plaintiff Aarons

48.     Plaintiff Aarons is a resident of Los Angeles, California.

49.     Plaintiff Aarons leased a new 2003 Mini Cooper Coupe that came equipped with a CVT style automatic transmission from Assael BMW Mini of Monrovia, California in or around April 2003.  Then, in August 2007, after his lease expired, Plaintiff Aarons purchased his 2003 Mini Cooper Coupe from BMW.

50.     When Plaintiff Aarons, in April 2003, leased, and then, in August 2007, purchased, his First Generation MINI from BMW, he relied on a reasonable expectation that the vehicle's automatic transmission was designed to last beyond the warranty period without the need for repair or replacement.  And when Plaintiff Aarons in 2003, leased, and in 2007, purchased his First Generation MINI, he also relied on a reasonable expectation that his First Generation MINI did not pose an unavoidable safety risk. Furthermore, given the small size of First Generation MINIs, the safety of the vehicle was particularly material.

51.     Plaintiff Aarons reviewed BMW's promotional materials and other information, and had BMW disclosed its knowledge of the CVT failures in April 2003, when Plaintiff Aarons leased his First Generation MINI, or in August 2007, when Plaintiff Aarons purchased his First Generation MINI, Plaintiff Aarons would have been seen such disclosures and would have been aware of them.  Indeed, BMW's omissions were material to Plaintiff Aarons, and he would not have leased or purchased a First Generation MINI, or he would not have paid the lease and purchase prices charged by BMW, had he known that the CVT installed in his vehicle was prone to unavoidable dangerous premature failure, or that he likely would have to spend approximately one-half to one-third of the cost of a vehicle for repairs in the early years of vehicle operation and ownership.  Accordingly, Plaintiff Aarons has been monetarily damaged and suffered injury in fact as a result of BMW's misconduct.

52.     In December 2010, with only approximately 65,000 miles on Plaintiff's

vehicle, the CVT suffered a complete failure. After taking his vehicle in for repairs and discussing the problem with BMW's customer service representatives, Plaintiff was informed that he would be required to purchase a new transmission at a cost of approximately $7,000 ($5,500 for a new transmission and an estimated $1,200 or more for labor to remove the old transmission and install the new one).

53.    When Plaintiff asked BMW's representatives how much his vehicle would be worth as a trade in for a new MINI, he was told that the company did not want his vehicle. Rather than invest approximately $7,000 into a car with an estimated resale value of $11,000, as a result of BMW's unlawful conduct, Plaintiff was forced to sell the vehicle to a third party for $3,300, causing him to suffer a substantial economic loss.

**Plaintiff Kollmer**

54.    Plaintiff Dolores Kollmer is a resident of San Pedro, California.

55.    On or about March 11, 2006, Plaintiff Kollmer purchased a new 2006 Mini Cooper from South Bay BMW/Mini in Torrance, California.

56.    Plaintiff Kollmer purchased her First Generation MINI primarily for his personal, family, or household purposes. Plaintiff Kollmer's First Generation MINI was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRC33556TJ76232.

57.    Plaintiff Kollmer reviewed BMW's promotional materials and other information, and had BMW disclosed its knowledge of the CVT failures in March 2006 when Plaintiff Kollmer purchased her First Generation MINI, Plaintiff Kollmer would have been seen such disclosures and would have been aware of them. Indeed, BMW's omissions were material to Plaintiff Kollmer, and she would not have purchased a First Generation MINI, or she would not have paid the purchase price charged by BMW, had she known that the CVT installed in her vehicle was prone to unavoidable dangerous premature failure, or that she likely would have to spend approximately one-half to one-third of the cost of a vehicle for repairs in the early years of vehicle operation and ownership. Accordingly, Plaintiff Kollmer has been monetarily damaged and suffered

1   injury in fact as a result of BMW's misconduct.

2       58.    Only after Plaintiff Kollmer purchased her First Generation MINI did the

3   CVT not function properly.  With approximately 63,000 miles on her First Generation

4   MINI's odometer, Plaintiff Kollmer began to experience problems with the CVT, namely

5   transmission slips.

6       59.    On September 29, 2011, with approximately 63,918 miles on the odometer,

7   Plaintiff Kollmer took her vehicle to South Bay BMW/Mini, complaining that the CVT

8   was "not shifting properly, especially at low speeds" and that her First Generation MINI

9   was not properly accelerating.   The dealer verified Plaintiff Kollmer's concerns and

10   advised her that she would have to pay approximately $9,000 to repair the defective CVT

11   because her First Generation MINI was no longer covered under BMW's warranty.  The

12   dealer also advised Plaintiff Kollmer that this was a known problem for First Generation

13   MINIs, and that she was the fifth customer that week to complain about it.

14       60.    However, after complaining to the dealer that it was wrong for BMW not to

15   pay for the entire cost of the CVT repair and replacement, the dealer called Plaintiff

16   Kollmer and advised her that if she paid $2,500, BMW would agree to pay the remainder.

17       61.    Because BMW refused to pay the entire cost of repair and replacement,

18   Plaintiff Kollmer did not repair her CVT at South Bay BMW/Mini.

19       62.    Rather, on October 3, 2011, with approximately 63,947 miles on the

20   odometer, Plaintiff Kollmer subsequently took her First Generation MINI to an

21   independent repair shop where she paid several hundred dollars to service her

22   transmission fluid in an attempt to at least momentarily alleviate the problem.

23       63.    At all times, Plaintiff Kollmer, like all Class Members, has driven her vehicle

24   in a foreseeable manner and in the manner in which it was intended to be used.

25

26

27

28

**Plaintiff Limon**

64.   On or about May 22, 2005, Plaintiff Limon purchased a brand new model year 2005 Mini Cooper with an CVT transmission for her personal use.  BMW sold the vehicle to Plaintiff Limon with a five-year or 50,000 mile warranty.  Plaintiff Limon and her daughter, Jaime Slovick, both spent significant time driving the 2005 Mini Cooper, and both experienced problems with the vehicle's CVT.

65.   Plaintiff Limon reviewed BMW's promotional materials and other information, and had BMW disclosed its knowledge of the CVT failures in May 2005 when Plaintiff Limon purchased her First Generation MINI, Plaintiff Limon would have been seen such disclosures and would have been aware of them.  Indeed, BMW's omissions were material to Plaintiff Limon, and she would not have purchased a First Generation MINI, or she would not have paid the purchase price charged by BMW, had she known that the CVT installed in her vehicle was prone to unavoidable dangerous premature failure, or that she likely would have to spend approximately one-half to one-third of the cost of a vehicle for repairs in the early years of vehicle operation and ownership.  Accordingly, Plaintiff Limon has been monetarily damaged and suffered injury in fact as a result of BMW's misconduct.

66.   Around March 2, 2007, while Ms. Slovick was driving Plaintiff Limon's First Generation MINI on the street at a speed of approximately 15-20 m.p.h., the CVT appeared to "jump gears" as it shifted, and the CVT suddenly downshifted into low gear. This caused a jolting deceleration in the speed of Plaintiff Limon's First Generation MINI, which could have dangerously interfered with the flow of surrounding traffic.

67.   Subsequently, Plaintiff Limon's First Generation MINI was taken to an authorized BMW dealer.  At the BMW dealership, however, Ms. Slovick was told that the problem could not be duplicated, the CVT appeared to be operating properly, and that the service representatives could not find anything wrong with Plaintiff Limon's First Generation MINI.

68.   Nevertheless, later that month, Plaintiff Limon and Ms. Slovick again

1   experienced several instances when the CVT in Plaintiff Limon's First Generation MINI

2   intermittently "slipped" or "locked-up" while the vehicle was in motion, causing a sudden

3   and jolting deceleration in speed. Again, Ms. Slovick took the vehicle to an authorized

4   BMW service representative, but she was told the CVT problem could not be duplicated

5   and that the service representative could find nothing wrong with the CVT in Plaintiff

6   Limon's First Generation MINI. At this time, Plaintiff Limon had less than 25,000 miles

7   on her Mini Cooper.

8       69.    Between March 2007 and the first quarter of 2010, Plaintiff Limon and Ms.

9   Slovick continued to experience problems with the CVT, and Plaintiff Limon's First

10   Generation MINI would intermittently slip or lock-up while driving, or the CVT would

11   suddenly downshift into low gear, causing a jolting deceleration in the speed. During this

12   period, Ms. Slovick took Plaintiff Limon's First Generation MINI to BMW service

13   representatives on several occasions, but each time she was told the CVT problem could

14   not be duplicated, and that the service representatives could not find anything wrong with

15   the CVT in Plaintiff Limon's First Generation MINI.

16       70.    On or about February 18, 2010, Ms. Slovick started the engine in Plaintiff

17   Limon's First Generation MINI and heard loud noises coming from the engine

18   compartment. The noises sounded like a broken fan motor, and Ms. Slovick believed that

19   some type of belt or other engine component had broken. At the time, Plaintiff Limon

20   had approximately 78,000 miles on her First Generation MINI.

21       71.    Again, Ms. Slovick took Plaintiff Limon's First Generation MINI to an

22   authorized BMW service representative. This time, the service representative diagnosed

23   an internal failure in the CVT, and recommended that the CVT be replaced. Ms. Slovick

24   was told by the BMW service representative that, because the warranty period had expired

25   on Plaintiff Limon's First Generation MINI, Plaintiff Limon would have to pay

26   approximately $10,000 to replace the CVT. Because the estimated cost was too much,

27   Plaintiff Limon declined to have her First Generation MINI repaired.

28       72.    Subsequently, Ms. Slovick took Plaintiff Limon's First Generation MINI to

1  an independent transmission repair specialist who diagnosed the problem with the CVT in

2  the vehicle as being premature transmission failure due to the defective CVT

3  transmission.

4      73.    Plaintiff Limon is informed and believes, and based thereon alleges, that as

5  part of its strategy to actively conceal its knowledge of the widespread premature CVT

6  failures, BMW secretly implemented a policy of paying for some or all of the cost of CVT

7  repairs or replacements for First Generation MINIs, or reimbursing some owners of First

8  Generation MINIs for such repair and replacement costs under certain circumstances,

9  even when the warranty period has expired, if the owners complained loudly enough to

10  BMW's corporate headquarters or customer relations department.

11                                     **Plaintiff Bourne-Miller**

12      74.    Plaintiff Lynette Bourne-Miller is a South Carolina citizen who resides in Mt.

13  Pleasant, South Carolina.  On or about October 10, 2003, Plaintiff purchased a 2004 Mini

14  Cooper from Rick Hendrick BMW in Charleston, South Carolina.

15      75.    Plaintiff purchased her vehicle primarily for her personal, family, or

16  household purposes.  The vehicle was manufactured, sold, distributed, advertised,

17  marketed, and warranted by Defendant, and bears the Vehicle Identification No.

18  WMWRC33464TJ53465.

19      76.    With around 21,000 miles on the vehicle's odometer, Plaintiff began to

20  experience CVT issues, namely the CVT getting stuck in one position when driven at

21  approximately 50-60 mph causing the RPM's to rise.

22      77.    On January 31, 2006, with approximately 21,957 miles on the odometer,

23  Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, complaining that the

24  "motor seems to rev at 55mph" and that the "RPMs go way up."  The BMW dealer

25  reprogrammed the vehicle's DME engine computer, cleared adaptation values in the CVT,

26  performed a clutch adaptation, and set up the ratio adaption.

27      78.    The repairs performed on plaintiff's vehicle were only temporary repairs and

28  did not actually repair the defect in material and/or workmanship as BMW was required

1 | to do under the New Vehicle Limited Warranty. Plaintiff next experienced problems with

2 | the CVT again on or around July 2008.

3 | 79. On July 14, 2008, with approximately 38,459 miles on the odometer,

4 | Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, complaining that "at 35

5 | or 55 MPH the RPM's will rev." The BMW dealer reprogrammed the vehicle's DME

6 | engine computer again, and readapted the CVT. The cost of the service was covered

7 | under the vehicle's express warranty.

8 | 80. However, once again, the BMW dealer implemented temporary repair that

9 | was meant to mask the defect for a period of time and did not repair or replace the

10 | defective CVT under warranty as they were required to do. Plaintiff next experienced

11 | problems with the CVT again on or around January 2011.

12 | 81. On January 31, 2011, with approximately 53,119 miles on the odometer,

13 | Plaintiff took her vehicle to BMW dealer, Rick Hendrick BMW, again complaining that

14 | the CVT "doesn't upshift to the highest gear." The BMW dealer stated that they "found

15 | transmission slippage at 60 MPH range and trans will not shift further." The BMW dealer

16 | informed Plaintiff for the first time that the CVT needed to be replaced at a cost of

17 | $7,340.00 and that the replacement would not be covered under warranty. Because BMW

18 | refused to pay the entire cost of repair, Plaintiff did not repair her transmission.

19 | 82. As a result, Plaintiff has been left with a vehicle with a transmission that does

20 | function properly. As a result of the CVT defect, plaintiff is no longer able to fully use

21 | her vehicle. In fact, plaintiff tries to limit the use of her vehicle whenever possible and

22 | will not use her vehicle when she needs to travel any sort of distance for fear that the CVT

23 | will suffer a catastrophic failure during the drive. Plaintiff has also been left with a

24 | vehicle that is worth substantially less because of the defective transmission that needs to

25 | be replaced.

26 | 83. At all times, Plaintiff, like all Class Members, has driven her vehicle in a

27 | foreseeable manner and in the manner in which it was intended to be used.

28 |

**Plaintiff Ferrer**

85.     Plaintiff Victor Ferrer is a New Jersey citizen who resides in Wayne, New Jersey.  On or about April 29, 2005, Mr. Ferrer purchased a new 2005 Mini Cooper Convertible from Prestige Mini in Ramsey, New Jersey.

86.     Mr. Ferrer purchased his vehicle primarily for his personal, family, or household purposes.   The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRF33575TG12796.

87.     With approximately 63,000 miles on the vehicle's odometer, Mr. Ferrer began to experience problems with his CVT, namely transmission slips.  On August 19, 2009, with approximately 63,000 miles on the odometer, Mr. Ferrer took his vehicle to Prestige Mini, complaining that the CVT was slipping.  Initially, the dealer told Mr. Ferrer that the transmission was fine; however, after leaving the dealer his vehicle automatically went into "emergency mode" and was unable to shift beyond 2nd gear.  Mr. Ferrer returned to the dealer. The dealer verified Mr. Ferrer's concerns and advised him that he would require a new transmission.

88.     On August 21, 2009, Mr. Ferrer's transmission suffered a complete failure while Mr. Ferrer was driving on the highway.  Mr. Ferrer's inoperative vehicle was towed to Prestige Mini, who informed Mr. Ferrer that he would have to pay $6,999.95 to repair the defective transmission because his vehicle was no longer covered under the manufacturer's warranty.

89.     Therefore, on August 21, 2009, with 65,368 miles on the odometer, Mr. Ferrer paid $6,999.95 for a replacement CVT.  However, not long after the CVT was replaced, Mr. Ferrer's vehicle began to lag and suffer gear slips once again.

90.     At all times, Mr. Ferrer, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Hare**

91.     Plaintiff Robert Hare is a Kentucky citizen who resides in Florence,

Kentucky. On June 11, 2002, Mr. Hare purchased a new 2002 Mini Cooper from Mini dealer, Cincinnati Mini, in Cincinnati, Ohio.

92.    Mr. Hare purchased his vehicle primarily for his personal, family, or household purposes. The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRC33472TE10892.

93.    With approximately 65,000 miles on the vehicle's odometer, Mr. Hare began to experience problems with his CVT, namely clunking noises from the transmission.

94.    On May 17, 2011, with 68,523 miles on the odometer, the CVT failed completely, rendering Mr. Hare's vehicle inoperative. Mr. Hare had the vehicle towed to Cincinnati Mini and advised them that his CVT had been making clunking noises and that the vehicle would not go anywhere when in gear. Cincinnati Mini informed Mr. Hare that the CVT needed to be replaced at a cost of $10,488.30. Mr. Hare declined to repair the transmission at that price.

95.    On May 19, 2011, Mr. Hare had his vehicle towed to Ridge Transmissions Inc., an independent transmission mechanic. Mr. Hare paid $7,439.02 for a replacement 2002 CVT Transmission.

96.    Unfortunately, the replacement CVT failed shortly after it was installed. Ridge Transmissions then replaced Mr. Hare's CVT for a second time with a newer model CVT.

97.    At all times, Mr. Hare, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Pugliese**

98.     Plaintiff Paul Pugliese is a Connecticut citizen who resides in Greenwich, Connecticut.  On May 12, 2007, Mr. Pugliese purchased a used 2005 Mini Cooper from Mini dealer, Felix F. Callari, Inc. d/b/a MINI of Fairfield County in Stamford, Connecticut.

99.     Mr. Pugliese purchased his vehicle primarily for his personal, family, or household purposes.  The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the Vehicle Identification No. WMWRE33515T696472.

100.    With approximately 70,000 miles on the vehicle's odometer, Mr. Pugliese began to experience problems with his CVT, namely gear slips and bucking movements.

101.    On August 10, 2011, with 74,083 miles on the odometer, Mr. Pugliese brought his vehicle to Mini of Fairfield County and advised that his vehicle had been exhibiting gear slips. Mini of Fairfield conducted a transmission inspection at a cost of $130.00, finding that the transmission "STARTED TO SHIFT REALLY BAD ONCE VEH GOT HOT" and that the vehicle "WILL NEED A NEW TRANSMISSION." Mini of Fairfield quoted Mr. Pugliese approximately $6,800 for a replacement transmission. Mr. Pugliese declined to repair the transmission at that price but paid $130 for the diagnosis.

102.    Following the trip to the dealership, Mr. Pugliese's vehicle continued to exhibit gear slips and bucking movements at a worsening rate.  Mr. Pugliese's vehicle is now inoperable.

103.    At all times, Mr. Pugliese, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Bailey**

104.    Plaintiff Darren Bailey is an Illinois citizen who resides in Xenia, Illinois.

1  He owns a 2002 Mini Cooper which he purchased used on Ebay in 2008 with 20,000

2  miles on the odometer.

3      105.   Mr. Bailey purchased his vehicle primarily for his personal, family, or

4  household purposes.  The vehicle was manufactured, sold, distributed, advertised,

5  marketed, and warranted by Defendant, and bears the Vehicle Identification No.

6  WMWRC33482TE11369.

7      106.   With approximately 64,000 miles on the odometer, as Mr. Bailey was

8  driving, his vehicle abruptly decelerated.  The transmission began to jerk the vehicle

9  violently and would not propel the vehicle above 10 mph.

10     107.   On or about October 14, 2011, Mr. Bailey took his vehicle to Mini dealer,

11 Mini of St. Louis, in Clayton, Missouri, complaining that the vehicle "will not drive over

12 10 mph" and that the transmission was "jerking on acceleration."  The Mini dealer found

13 metal flakes in the transmission fluid and informed Mr. Bailey that his transmission would

14 need to be replaced at a cost of approximately $8,500.  Because BMW refused to pay the

15 entire cost of repair, Mr. Bailey declined the repair at that time.  Mr. Bailey paid $123.71

16 for the inspection and diagnosis.

17     108.   On January 9th, 2012, Mr. Bailey purchased a used CVT from Modern

18 Imports in St. Louis Missouri for $3,254.73.  On or about January 23, 3012, local

19 mechanic Greg Ritter of Ritter's Auto, in Kinmundy, Illinois, installed the transmission.

20 Despite the replacement, Mr. Bailey's vehicle continues to suffer from gear slips, stalls,

21 and loss of power.

22     109.   At all times, Mr. Bailey, like all Class Members, has driven his vehicle in a

23 foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Bonomo**

24

25     110.   Plaintiff Bonomo is a citizen of the State of Florida and a resident of Palm

26 Beach County, Florida. In 2009, Plaintiff purchased a pre-owned 2004 Mini Cooper (VIN:

27 WMWRC33414TJ58332) for personal use within the State of Florida. Plaintiff paid a

28 premium for his Vehicle, and he subsequently was required to pay $6,906.96 for repairs as

a direct result of the CVT defect described above.

111.   At all times, Mr. Bonomo, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## STATUTE OF LIMITATIONS

112.   Any applicable statutes of limitations have been tolled by BMW's knowing and active concealment, denial, and misleading actions, as alleged herein.  Plaintiffs and members of the Class defined below were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the true latent nature of the CVT defect or any of the issues and facts alleged herein.

113.   BMW is under a continuous duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of First Generation MINIs, and to disclose the existence of the material failure of the CVT.  BMW knowingly, affirmatively, and actively concealed the true character, quality, and nature of the CVT defect.  Plaintiffs and members of the Class reasonably relied upon BMW's knowing, affirmative, and active concealment.  Based on the foregoing, BMW is estopped from relying on any statutes of limitation as a defense in this action.

114.   The causes of action alleged herein did or will only accrue upon discovery of the latent CVT defect, as a result of BMW's fraudulent concealment of the CVT defect. Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the CVT defect.

## CLASS ACTION ALLEGATIONS

115.   Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

116.   The class Plaintiffs seek to represent is defined as follows:

All current and former owners and lessees within the United States of the following vehicles equipped with a Continuously Variable Automatic Transmission:

- MINI R50 (June 11, 2001—Nov. 28, 2006 production period);
- MINI R52 (March 6, 2004—July 31, 2008 production period).

Excluded from the Class are BMW's officers, directors, and employees (the "Class").

117. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

118. Plaintiffs reserve the right to establish subclasses as appropriate.

119. This action is brought and properly may be maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3) and satisfies the requirements thereof.

120. Community of Interest: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

121. Numerosity: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by BMW. At this time, Plaintiffs are informed and believe that the Class includes thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

122. Ascertainablity: Names and addresses of members of the Class are available from BMW's records. Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

123. Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class which he seeks to represent under Federal Rule of Civil Procedure 23(a)(3)

1  because Plaintiffs and each member of the Class has been subjected to the same deceptive

2  and improper practices and has been damaged in the same manner thereby.

3       124.   Adequacy:  Plaintiffs will fairly and adequately represent and protect the

4  interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).

5  Plaintiffs are adequate representative of the Class, because he has no interests which are

6  adverse to the interests of the members of the Class.  Plaintiffs are committed to the

7  vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who

8  are competent and experienced in handling class action litigation on behalf of consumers.

9       125.   Superiority: A class action is superior to all other available methods of the

10  fair and efficient adjudication of the claims asserted in this action under Federal Rule of

11  Civil Procedure 23(b)(3) because:

12       (a)   The expense and burden of individual litigation make it economically

13              unfeasible for members of the Class to seek to redress their "negative

14              value" claims other than through the procedure of a class action.

15       (b)   If separate actions were brought by individual members of the Class,

16              the resulting duplicity of lawsuits would cause members to seek to

17              redress their "negative value" claims other than through the procedure

18              of a class action; and

19       (c)   Absent a class action, BMW likely would retain the benefits of its

20              wrongdoing, and there would be a failure of justice.

21       126.   Common questions of law and fact exist as to the members of the Class, as

22  required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions

23  which affect individual members of the Class within the meaning of Federal Rule of Civil

24  Procedure 23(b)(3).

25       127.   The common questions of fact include, but are not limited to, the following:

26       (a)   Whether CVTs installed in First Generation MINIs were prone to

27              premature failure;

28       (b)   Whether BMW knew or should have known that CVTs installed in

First Generation MINIs were prone to premature failure;

(c)   Whether BMW had a duty to disclose the the CVTs installed in First Generation MINIs were prone to premature failure;

(d)   Whether BMW breached its duty to disclose the the CVTs installed in First Generation MINIS were prone to premature failure;

(e)   Whether BMW's conduct, as alleged herein, was unlawful, unfair, or fraudulent under the consumer protection laws of all 50 states;

(f)   Whether BMW's conduct breached the implied warranty of merchantability under the laws of all 50 states;

(g)   Whether BMW's conduct was breach of the written warranty under the Magnuson-Moss Warranty Act;

(h)   Whether BMW was unjustly enriched at the expense of the Class;

(i)   Whether BMW actively concealed material facts from Plaintiffs and members of the Class for the purpose of transferring the cost of the CVT failure to consumers; and

(j)   Whether Plaintiffs and members of the Class are entitled to restitution and damages.

128.   In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for BMW;

(b)   The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or

1 | impede their ability to protect their interests; and

2 | (c)     BMW has acted or refused to act on grounds generally applicable to

3 | the Class, thereby making appropriate final injunctive relief or

4 | corresponding declaratory relief with respect to the Class as a whole

5 | and necessitating that any such relief be extended to members of the

6 | Class on a mandatory, class-wide basis.

7 | 129.   Plaintiffs are not aware of any difficulty which will be encountered in the

8 | management of this litigation which should preclude its maintenance as a class action.

9 | **FIRST CAUSE OF ACTION**

10 | **Violation of the Consumers Legal Remedies Act**

11 | **(Cal. Civil Code § 1750 *et seq.*)**

12 | 130.   Plaintiffs hereby incorporate by reference the allegations contained in the

13 | preceding paragraphs of this Complaint.

14 | 131.   Plaintiffs bring this cause of action against BMW on behalf of themselves

15 | and members of the Class.

16 | 132.   This cause of action is brought under the Consumers Legal Remedies Act,

17 | California Civil Code sections 1750 *et seq.* ("CLRA"). Plaintiffs and members of the

18 | Class are consumers as defined by California Civil Code section 1761(d). First

19 | Generation MINIs are goods within the meaning of California Civil Code section 1761(a).

20 | 133.   BMW violated and continues to violate the CLRA by engaging in the

21 | following practices proscribed by California Civil Code section 1770(a) in transactions

22 | with Plaintiffs and members of the Class, which were intended to result in, and did result

23 | in, the sale of First Generation MINIs:

24

25

26

27

28

(5)    Representing that [First Generation MINIs have]…
characteristics…[and] uses…which they do not have….

(7)    Representing that [First Generation MINIs] are of a
particular standard…if they are of another.

(9)    Advertising goods…with intent not to sell them as
advertised.

134.   BMW violated the CRLA by failing to timely disclose to Plaintiff and members of the Class that the CVTs installed in First Generation MINIs were prone to premature failure.

135.   BMW further violated the CRLA by actively concealing material facts from Plaintiffs and members of the Class for the purpose of transferring the cost of the CVT defect to consumers.

136.   BMW also violated the CLRA because its failure to disclose to Plaintiffs and members of the Class the material fact that CVTs were prone to premature failure risked the safety of owners and occupants of First Generation MINIs.

137.   As a result of BMW's failure to disclose that CVTs installed in First Generation MINIs were prone to premature failure, Plaintiffs and members of the Class were exposed to safety risks, were required to spend approximately $6,000 to $9,000 (one-third to one-half of the original purchase price) to repair or replace their CVTs, or sell their vehicle without repair for a substantial loss.  The fact that the CVTs installed in First Generation MINIs were prone to premature failure is material because no reasonable consumer expects that they will have to spend approximately one-half to one-third of the cost of a vehicle for repairs in the early years of vehicle ownership, and because Plaintiffs and members of the Class had a reasonable expectation that the vehicles would not suffer from a premature failure that would present a safety risk, especially given the small size of the vehicles.

138.   On May 19, 2011, via certified mail, return receipt requested, under Section 1782 of the CLRA, Plaintiff Aarons' counsel, on behalf of Plaintiff Aarons and all other members of the Class, notified BMW in writing of the particular violations of Section

1 | 1770, and demanded that it rectify the problems associated with the behavior detailed

2 | above, which acts and practices are in violation of Section 1770.

3 |     139.    BMW failed to adequately respond to Plaintiff Aarons' above-described

4 | demand, nor did it give notice to all affected consumers under Section 1782.  A

5 | representative from BMW responded via email on June 16, 2011, stating that "[a] team of

6 | corporate, market and dealer personnel is currently investigating the service history," and

7 | that the company "will soon be in contact with you to address your client's concern."

8 | Despite Plaintiff Aarons' counsel's repeated attempts to follow up with BMW, no

9 | substantive response was ever provided.  Therefore, under Section 1780(a) of the CLRA,

10 | Plaintiffs and members of the Class seek actual and punitive damages.

11 |     140.  Under Section 1782(d) of the CLRA, Plaintiffs, on behalf of themselves and

12 | members of the Class, also seeks an order enjoining the act and practices described above,

13 | restitution of property, any other relief that the court deems proper.

14 |     141.  BMW's conduct is malicious, fraudulent, and wanton, and the company

15 | continues to intentionally mislead and withhold material information from consumers.

16 | The malicious, fraudulent, and wanton nature of BMW's conduct is evidenced by the fact

17 | that even after receiving notice of the issues described above from Plaintiffs and countless

18 | other consumers, BMW continues to deny that there is any problem with the CVT

19 | installed in First Generation MINIs and refuses to offer Plaintiffs and members of the

20 | Class any remedy for the damages it has caused.

21 | **SECOND CAUSE OF ACTION**

22 | **Violation of Unfair Business Practices Act**

23 | **(California Business & Professions Code §§ 17200 *et seq.*)**

24 |     142.  Plaintiffs hereby incorporate by reference the allegations contained in the

25 | preceding paragraphs of this Complaint.

26 |     143.  Plaintiffs brings this cause of action on behalf of themselves and the

27 | members of the Class.

28 |     144.  California Business and Professions Code section 17200 prohibits "any

1  unlawful, unfair or fraudulent business act or practice." For the reasons described above,

2  BMW has engaged in unlawful, unfair, and/or fraudulent business acts or practices in

3  violation of California Business and Professions Code section 17200.

4    145.  BMW's misrepresentations and omissions of material facts, as set forth

5  herein, constitute an "unlawful" practice because they violate California Civil Code

6  sections 1572, 1573, 1709, 1710, 1711, 1770, California Business and Professions Code

7  sections 17200 *et seq*. and the common law.

8    146.  BMW's misrepresentations and omissions of material facts, as set forth

9  herein, also constitute "unfair" business acts and practices within the meaning of

10  California Business and Professions Code sections 17200 *et seq*., in that BMW's conduct

11  was injurious to consumers, offended public policy, and was unethical and unscrupulous.

12  Plaintiffs also assert a violation of public policy by withholding material facts from

13  consumers. BMW's violation of consumer protection and unfair competition laws in

14  California and other states resulted in harm to consumers.

15    147.  There were reasonable alternatives available to BMW to further BMW's

16  legitimate business interests, other than the conduct described herein.

17    148.  California Business and Professions Code section 17200 also prohibits any

18  "fraudulent business act or practice."

19    149.  BMW's misrepresentations and concealment of material facts, as set forth

20  above, were false, misleading, and likely to deceive the public within the meaning of

21  California Business and Professions Code section 17200.

22    150.  BMW's misrepresentations and concealment were made with knowledge of

23  their effect, and to induce Plaintiffs and members of the Class to purchase First

24  Generation MINIs and to discourage them from seeking replacement while the vehicles

25  were under warranty, thereby unlawfully transferring the costs from BMW to Plaintiffs

26  and members of the Class. Plaintiffs and members of the Class justifiable relied on upon

27  BMW's knowing, affirmative, and active concealment when they purchased their First

28  Generation MINIs, and when they failed to seek to have their CVT replaced within the

1  warranty period.

2      151.   BMW's conduct caused and continues to cause injury to Plaintiffs members

3  of the Class.  Plaintiffs and members of the Class have suffered injury in fact and have

4  lost money as a result of BMW's conduct.

5      152.   As a result of BMW's failure to disclose that CVTs installed in First

6  Generation MINIs were prone to premature failure, Plaintiffs and members of the Class

7  were exposed to safety risks, were required to spend approximately $6,000 to $9,000

8  (one-third to one-half of the original purchase price) to repair or replace their CVTs, or

9  sell their vehicle without repair for a substantial loss.  Therefore, the fact that the CVTs

10 installed in First Generation MINIs were prone to premature failure is material because no

11 reasonable consumer expects that they will have to spend approximately one half to one

12 third of the cost of a vehicle for repairs in the early years of vehicle ownership, and

13 because Plaintiffs and members of the Class had a reasonable expectation that the vehicles

14 would not suffer from a premature failure that would present a safety risk, especially

15 given the small size of the vehicles.

16     153.   Additionally, the fact that CVTs installed in First Generation MINIs were

17 prone to premature failure is material to consumers because it presents a safety issue and

18 places the driver and passengers at risk of serious harm.  When CVTs fail, they do so

19 without warning, resulting in a complete loss of power to the drive wheels.  When CVTs

20 fail while a vehicle is moving, occupants of the vehicle are exposed to rear end collisions

21 and other accidents caused by the driver's inability to maintain an appropriate speed.

22     154.   Accordingly, Plaintiffs and members of the Class would not have purchased

23 their First Generation MINIs had it not been for BMW's misrepresentations and

24 concealment of material facts.

25     155.   BMW has thus engaged in unlawful, unfair, and fraudulent business acts

26 entitling Plaintiffs and members of the Class to judgment and equitable relief against

27 BMW, as set forth in the Prayer for Relief.

28     156.   Additionally, under Business and Professions Code section 17203, Plaintiffs

1  and members of the Class seek an order requiring BMW to immediately cease such acts of

2  unlawful, unfair, and fraudulent business practices and require BMW to correct its

3  actions.

### THIRD CAUSE OF ACTION

**Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act**

**(California Civil Code §§ 1792 and 1791.1 *et seq.*)**

157.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

158.   BMW was at all relevant times the manufacturer, distributor, warrantor, or seller of First Generation MINIs.  BMW knew or had reason to know of the specific use for which First Generation MINIs were purchased.

159.   BMW provided Plaintiffs and members of the Class with an implied warranty that First Generation MINIs and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold.  However, First Generation MINIs are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, First Generation MINIs and their CVTs suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

160.   BMW impliedly warranted that First Generation MINIs were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that First Generation MINIs and their CVTs were manufactured, supplied, distributed, or sold by BMW were safe and reliable for providing transportation; and (ii) a warranty that First Generation MINIs and their CVTs would be fit for their intended use while First Generation MINIs were being operated.

161.   Contrary to the applicable implied warranties, First Generation MINIs and their CVTs at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and members of the Class with reliable, durable, and safe transportation.  Instead, First Generation MINIs are defective, including but not limited to

1 | the defective design and manufacture of their CVTs.

2 |   162. BMW's actions, as complained of herein, breached the implied warranty that

3 | First Generation MINIs were of merchantable quality and fit for such use in violation of

4 | California Civil Code §§ 1792 and 1791.1.

5 | **FOURTH CAUSE OF ACTION**

6 | **Unjust Enrichment**

7 |   163. Plaintiffs hereby incorporate by reference the allegations contained in the

8 | preceding paragraphs of this Complaint.

9 |   164. BMW profited unjustly from the lease and sale of First Generation MINIs at

10 | inflated prices as a result of concealing its knowledge of premature CVT failures,

11 | engaging in a secret warranty program, providing repair services, or selling replacement

12 | parts for the CVTs.

13 |   165. As a proximate result of their wrongful acts and omissions described herein,

14 | and as a result of their ill-gotten benefits and profits, BMW has been unjustly enriched at

15 | the expense of Plaintiffs and the Class.

16 |   166. The circumstances as described herein are such that it would be inequitable

17 | for BMW to retain these ill-gotten benefits and profits without paying the value thereof to

18 | Plaintiffs and the Class.

19 |   167. Plaintiffs and members of the Class are entitled to restitution of the amount

20 | of BMW's ill-gotten gains, benefits and profits, including interest, resulting from their

21 | unlawful, unjust and inequitable conduct, as described above.

22 |   168. Accordingly, Plaintiffs and members of the Class seek an order establishing

23 | BMW as constructive trustees of the gains, benefits and profits that served to unjustly

24 | enrich them, together with interest during the period in which BMW has retained such

25 | benefits and profits, and requiring BMW to disgorge those profits to Plaintiffs and

26 | members of the Class in a manner to be determined by the Court.

27 |

28 |

# FIFTH CAUSE OF ACTION

## BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301 *ET SEQ.*

169.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

170.   Plaintiffs and the other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

171.   Defendant are a "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

172.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

173.   Defendant' express warranty is a "written warranty" within the meaning of 1515 U.S.C. § 2301(6).

174.   Defendant breached the express warranty by:

    a. Extending a 4-year/50,000-mile New Vehicle Limited Warranty ("NVL Warranty"), and in some cases, an extended warranty, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    b. Selling and leasing Class Vehicles with CVTs that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

    c. Refusing to honor the express warranty by repairing or replacing, free of charge, the CVTs and instead providing temporary fixes designed to mask the CVT defect during the NVL warranty and then charging for repair and replacement parts when the NVL warranty expired.

175.   Defendant' breach of the express warranty deprived the Plaintiffs and the other Class Members of the benefits of their bargains.

176.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

177.   Defendant have been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other Class Members brought their vehicles in for diagnoses and repair of the CVT.

178.   As a direct and proximate result of Defendant' breach of written warranty, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant' conduct damaged Plaintiffs and Class Members who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## SIXTH CAUSE OF ACTION

### Violations of Various States' Express Warranty Statutes

179.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

180.   Plaintiffs bring this action on behalf of themselves and on behalf of the Class against Defendant under the express warranty statutes of the states in which they purchased the Class Vehicles.

181.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became part of the basis of the bargain.  Accordingly, Defendant' express warranty is an express warranty under state law express warranty statutes referred to herein.

182.   The CVT and its component parts, were manufactured and/or installed and/or distributed by Defendant in the Class Vehicles and are covered by the express warranty.

183.   Defendant breached the express warranty by:

    a.    Extending a warranty to owners or lessees of the Class Vehicles, thereby warranting to repair or replace any defect in material or

workmanship at no cost to the owner or lessee;

   b. Selling and leasing Class Vehicles with CVTs that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

   c. Refusing to honor the express warranty by repairing or replacing, free of charge, the CVT or any of its component parts affected by the CVT Defect, and instead charging for repair and replacement parts.

184. Plaintiffs (or the prior owners of their Class Vehicles) notified Defendant of the breach within a reasonable time, and/or were not required to do so because affording them a reasonable opportunity to cure its breach of written warranty would have been futile.  Defendant were also on notice of the CVT Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the CVTs, and through its own maintenance records.

185. As a direct and proximate cause of Defendant' breach, Plaintiffs and the other Class Members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, *i.e.*, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.  Additionally, Plaintiffs and the other Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

186. Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## SEVENTH CAUSE OF ACTION

### Violations of Various States' Implied Warranty Statutes other than California

187. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

188. Plaintiffs bring this action on behalf of themselves and on behalf of the Class against all Defendant, under the implied warranty statutes of the states in which they purchased the Class Vehicles.

189. Defendant were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

190. Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffer from a CVT Defect that can put the lives of its occupants and other drivers who share the road with them at risk.

191. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their CVTs were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their CVTs would be fit for their intended use while the Class Vehicles were being operated.

192. Contrary to the applicable implied warranties, the Class Vehicles and their CVTs at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including but not limited to the defective design and manufacture of their CVTs.

## EIGHTH CAUSE OF ACTION

### Violations of Various States' Consumer Protection Statutes

193. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

194.   Plaintiffs bring this action on behalf of themselves and on behalf of the Class against all Defendant under the consumer protection statutes of the states in which they purchased the Class Vehicles.

195.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

196.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of all Class Members.

197.   Plaintiffs and Class members are consumers who bought or leased the Class Vehicles for personal, family, or household purposes.

198.   The Class Vehicles and their parts and replacement parts are goods or merchandise, and Plaintiffs' purchases and leases of the Class Vehicles constitute transactions. Defendant' sale, leasing, and/or repair of Class Vehicles through its authorized dealers occur in the regular course of Defendant' business.

199.   By failing to disclose and concealing the defective nature of the Class Vehicles and their CVTs from Plaintiffs and prospective Class Members, Defendant have engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as they represented that their Class Vehicles and their CVTs had characteristics and benefits that they do not have, and represented that their Class Vehicles and their CVTs were of a particular standard, quality, or grade when they were of another.

200.   Defendant' unfair and deceptive acts or practices occurred repeatedly in Defendant' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

201.   Defendant knew that their Class Vehicles and their CVTs suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

202.   Defendant were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles' and their CVTs and/or the associated repair costs because:

      a.   Defendant were in a superior position to know the true state of facts about the safety defects contained in the Class Vehicles and their CVTs;

      b.   Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their CVTs have a dangerous safety defect until they experienced the transmission failure; and

      c.   Defendant knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the safety defect.

203.   By failing to disclose the CVT Defect, Defendant have knowingly and intentionally concealed material facts and breached their duty not to do so.

204.   The facts concealed or not disclosed by Defendant to Plaintiffs and the Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them. Had Plaintiffs and other Class Members known that the Class Vehicles and their CVTs were defective, they would not have purchased the Class Vehicles or would have paid less for them.

205.   Plaintiffs and Class Members are reasonable consumers who do not expect that with proper maintenance their CVTS would fail prematurely. That is the reasonable and objective consumer expectation for transmissions.

206.   As a result of Defendant' misconduct, Plaintiffs and Class Members have been harmed and have suffered actual damages in that the Class Vehicles and their CVTs are defective and fail prematurely.

207.   As a direct and proximate result of Defendant' unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

1    Plaintiffs and the other Class Members are entitled to legal and equitable relief

2    against Defendant, including damages, consequential damages, specific performance,

3    rescission, attorneys' fees, costs of suit, and other relief as appropriate.

4                          **PRAYER FOR RELIEF**

5    Plaintiffs, and on behalf of themselves and all others similarly situated, request

6    that the Court enter judgment against BMW, as follows:

7    1.    Certifying the Class as requested herein;

8    2.    Ordering that BMW is financially responsible for notifying all members of

9    the Class of the alleged omissions and active concealment of material facts discussed

10   herein;

11   3.    Awarding Plaintiffs and the members of the Class compensatory damages in

12   an amount according to proof at trial;

13   4.    Awarding restitution and disgorgement of BMW's revenues to Plaintiffs and

14   members of the Class;

15   5.    Awarding declaratory and injunctive relief as permitted by law or equity,

16   including enjoining BMW from continuing the unlawful practices as set forth herein, and

17   directing BMW to identify, with Court supervision, victims of its conduct and pay them

18   restitution and disgorgement of all monies acquired by BMW by means of any act or

19   practice declared by this Court to be wrongful;

20   6.    Awarding to Plaintiffs and the Class punitive damages;

21   7.    Ordering BMW to engage in corrective advertising;

22   8.    Awarding interest on the monies wrongfully obtained from the date of

23   collection through the date of entry of judgment in this action;

24   9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably

25   incurred in connection with the commencement and prosecution of this action; and

26   10.   For such other and further relief as the Court deems just and proper.

27

28

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiffs request trial by jury on all issues so triable.

3                                      Respectfully submitted,

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Roland Tellis, California Bar No. 186269
rtellis@baronbudd.com
Mark Pifko, California Bar No. 228412
mpifko@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Ph:  (818)839-2333; Fax:  (818)986-9698

Jonathan Shub (*pro hac vice*)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania 19102
Telephone:      (215) 564-2300
Facsimile:      (215) 851-8029
jshub@seegerweiss.com

Gregory B. Scarlett, Esq.
**WASSERMAN, COMDEN, CASSELMAN &**
**ESENSTEN, LLP**
5567 Reseda Boulevard, Suite 330
Tarzana, California 91357
Telephone: 818.705.6800
Facsimile: 818.996.8266
gscarlett@wccelaw.com

Matthew R. Mendelsohn
**MAZIE SLATER KATZ &**
**FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: (973) 228-9898
Facsimile: (973) 228-0303
mmendelsohn@mskf.net

Payam Shahian
**STRATEGIC LEGAL PRACTICES, APC**
1875 Century Park East, Suite 700
Los Angeles, California 90067
Telephone:      (310) 277-1040
Facsimile:      (310) 943-3838
pshahian@slpattorney.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jordan L. Lurie
**CAPSTONE LAW, APC**
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:     (310) 556-4811
Facsimile:     (310) 943-0396
Jordan.Lurie@capstonelawyers.com

Lance Harke
Howard M. Bushman
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, FL 33138
305-536-8220 Main Line
305-536-8229 Facsimile
lharke@harkeclasby.com
hbushman@harkeclasby.com